[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10809
Non-Argument Calendar

_____

D.C. Docket No. 4:18-cv-00198-WTM-CLR

MONICA WILLIAMS,

Plaintiff - Appellant,

versus

HOUSING AUTHORITY OF SAVANNAH,
INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(October 29, 2020)

Before WILSON, MARTIN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Monica Williams appeals the district court's grant of summary judgment in favor of her former employer, the Housing Authority of Savannah, Inc. ("HAS"), on her claims of sex discrimination and retaliation under Title VII, *see* 42 U.S.C. §§ 2000e-2 & 2000e-3.  Williams contends that the district court made several errors in its analysis and that there is sufficient evidence in the record to reach a jury on her claims.  After careful review, we affirm.

## I.

The relevant facts, which we present in the light most favorable to Williams, are as follows.[1]  HAS hired Williams in June 2017 to be an Assistant Asset Manager at two publicly subsidized apartment complexes which we will refer to collectively as "River Pointe."[2]  Williams's duties included inspecting housing units, assisting with unit recertification, and completing paperwork.  In order to complete these tasks, HAS gave Williams a set of keys—largely indistinguishable from similar sets given to others—that enabled her near-universal access to River Pointe, including all apartment units.  Williams was told that she was responsible for her keys and

---

[1] *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018) ("We review an entry of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party." (quotation marks omitted)).

[2] The two River Pointe complexes were formerly public-housing neighborhoods that were renovated, revitalized, and converted from public housing to subsidized privately owned affordable housing under the U.S. Department of Housing and Urban Development's Rental Assistance Demonstration program.  After this conversion, HAS retained some management responsibilities at River Pointe under a contract with a property-management company.

should not "let them out of [her] sight," and she understood that losing her keys could put residents and others in danger.

On Friday, February 2, 2018, Williams went to River Pointe to inspect residential units with three other individuals:  Robert Marshall, the HAS Director of Facilities Management; Rafaella Nutini (then Rafaella Gavino), a HAS Real Estate Analyst; and Roger Salazar, a subcontractor who was not employed by HAS.  The inspections—largely done in teams of two, with Williams and Nutini together—consisted of looking for basically anything that needed to be fixed.  If no one was present in a unit, Williams left a signed notice in the unit informing the resident of the inspection.

As they walked as a group between inspections, Williams was subjected to sexually objectifying comments by Marshall and Salazar.[3]   Salazar joked with Marshall that Williams was "pretty" and had a "cute" rear end and a "sexy walk." Marshall "egg[ed] him on," responding, "yeah, she's pretty, look at her heels," and made another joke about her. Williams asked them to stop, stating that their comments were not funny or professional.  Nutini also told them to stop and that their behavior was inappropriate.  Marshall and Salazar laughed in response,

---

[3] Marshall denies making or hearing these comments, but at summary judgment we must credit Williams's version of events. *See Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("[W]hen conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." (emphasis omitted)).

3

claiming they were just joking.  After these events, Williams and Nutini split off from the two men to continue the inspections.

These were not the first inappropriate comments Williams heard from Marshall and Salazar.  A few months earlier, Marshall told Williams in his office that he wished "he would have met [her] before he got married."  Williams told him to "stop right there, I'm married and that's not a joke," and then walked out.  A couple months before that, Salazar called Williams "Sweetie," though in other interactions before February 2018 he had been professional.

Turning back to the events on February 2, the River Pointe inspection group reconvened near the end of the day, and Williams informed Marshall that she and Nutini had been unable to relock a utility door in one of the units.  Marshall told Williams to give her keys to Salazar so that he could go and secure the door. Williams said, "No, I can't give him my keys," but Marshall ordered, "I'm your boss, give him the keys."  Soon after, Salazar grabbed her from behind and tried to kiss her and take the keys.  Williams turned and punched him twice, warning him "not to ever touch [her]."  Marshall did not see these events, but when Nutini informed him of them, he made a joke about Williams and Salazar "needing a private moment."  He again ordered Williams to give Salazar her keys.  Williams gave in and handed over two master keys—one for the apartment units and one for the utility doors—so that Salazar could enter the apartment unit and secure the utility door.

4

Salazar then left, and Williams did not see him again. Williams left River Pointe shortly thereafter.

After leaving River Pointe, Williams attempted to report the incident to Human Resources, but the office was closed for the weekend. She then called her supervisor, Asset Manager Kim-Nee Stewart, and let her know what had happened and that she was going to report the incident to Human Resources. Stewart said that "there was nothing she could do about it."

Williams reached out directly to Salazar's employer to complain of his actions, and then, on Monday, February 5, 2018, went back to Human Resources to complain of the harassment. Williams spoke with Douglas Reed, the HAS Director of Human Resources, who asked her to prepare a written statement. She did so, focusing on Salazar's advances and attempt to kiss her. She did not relay any facts regarding Marshall's order to hand over her keys. Reed also asked Nutini to prepare a written statement regarding what she had witnessed.

Meanwhile, at 10:16 a.m. that same day, Stewart sent an email to her supervisor, Earline Davis, as well as to Reed and Marshall to notify them that Williams had reported on Friday that an "incident took place involving one of the contractors." Approximately thirty minutes later, Stewart sent another email to the same recipients with the subject, "Keys." Stewart wrote that she had just received a spare set of master keys from a River Pointe resident who stated they were "left in

5

her unit on Friday by Monica Williams." Stewart advised that the "keys were not reported missing to me." Davis replied at 11:20 a.m. that it was "gross neglect" for Williams to leave her keys and not report that they were "out of staff control," and she asked Stewart to "prepare [Williams's] termination papers."

The next day, February 6, Stewart obtained a written statement from the resident who had returned the keys. The resident wrote that she "found the keys that were left on my dining room table during inspection on Friday 2/2/18 by the manager." Meanwhile, Williams was informed by Kenneth Clark, the HAS Director of Development Services, that Salazar would no longer be working at River Pointe. Clark had contacted Salazar's employer and requested that he no longer work with HAS in Savannah.

When Williams arrived for work on February 7, she was asked to meet with Reed and Stewart. In Reed's office, Stewart read Williams a termination notice, which stated that was being fired because she "left a set of master keys in a[n] occupied unit and never reported the keys as missing," putting residents in danger and placing HAS at extreme risk of liability. Williams protested that Marshall had ordered her to hand the keys to Salazar. It is undisputed that this was the first time Williams told either Stewart or Reed of this fact. Reed responded that she could appeal the termination decision, but Williams chose not to.

Williams filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination, harassment, and retaliation. After receiving her right-to-sue letter, she filed this lawsuit in the U.S. District Court for the Southern District of Georgia, alleging that HAS had violated Title VII in two ways: (1) discriminating against her based on her sex when it "failed to investigate her allegations and wrongfully terminated her employment"; and (2) terminating her employment in retaliation for filing a Human Resources complaint.

Following discovery, the district court granted summary judgment to HAS. The court first concluded that Williams did not establish either a *prima facie* case of sex discrimination or that HAS's proffered legitimate, nondiscriminatory reason for terminating her—that she violated its policy that employees maintain possession of master keys at all times—was a pretext for an underlying discriminatory motive. The court explained that, even if Williams had been ordered by Marshall to turn her keys over to Salazar, she "failed to regain possession of her keys or to report to her direct supervisor that Salazar had possession of the keys at the end of the day on Feb. 2." Second, while Williams did not specifically allege a hostile work environment claim in her complaint, the court opined that her evidence did not show a sufficiently severe or pervasive work environment. And finally, the court found

7

that Williams had established a *prima facie* case of retaliation but that she had not shown pretext in HAS's proffered reason for her termination.  Williams now appeals.

## II.

We review *de novo* a district court's grant of summary judgment, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1263–64 (11th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is no triable dispute unless a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  If the evidence presented by the nonmoving party is "merely colorable" or not "significantly probative," summary judgment may be granted.  *Id.* at 249–50.  We may affirm the district court's judgment on any adequate ground supported by the record, whether the court relied on that ground or not.  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251–52 & 1252 n.5 (11th Cir. 2013).

## III.

Williams contends that the district court committed several legal errors in granting summary judgment, including failing to apply a mixed-motive analysis, failing to analyze her claims under the "convincing mosaic" standard, ignoring evidence of pretext, and determining without analysis that her allegations of sexual

8

harassment were not sufficiently severe or pervasive.  She maintains that there are genuine issues of material fact that must be resolved by a jury.

**A.**

We begin with Williams's discrimination claim based on her termination. Title VII prohibits employers from discriminating against their employees on the basis of sex, among other protected classes.  42 U.S.C. § 2000e-2(a)(1).  When a plaintiff claims that she was fired due to her sex, she may rely on two legal theories to prove unlawful discrimination:  (1) the "but for" causation or "single-motive" theory; and (2) the "mixed-motive" theory.  *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).

Under the mixed-motive theory, an employee can succeed "by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action."[4] *Id.* (quoting 42 U.S.C. § 2000e-2(m)).  The summary-judgment inquiry is simply whether a reasonable jury could conclude that the plaintiff's sex (or other protected class) was a motivating factor for the adverse employment action.  *Id.* at 1239–40.

---

[4] When a plaintiff proves a violation of Title VII based on a mixed-motive theory, the employer has the opportunity to show that it would have "taken the same action in the absence of the impermissible motivating factor," which if proved prevents an award of damages and certain injunctive relief.  42 U.S.C. § 2000e-5(g)(2)(B).

Under the single-motive theory, by contrast, an employee succeeds with proof that unlawful animus was "the true reason for the adverse action." *Id.* at 1235. The analysis under this theory generally proceeds under the well-worn *McDonnell Douglas*[5] burden-shifting framework, which requires the plaintiff to first establish a *prima facie* case of discrimination. *Lewis v. City of Union City, Ga. (Lewis I)*, 918 F.3d 1213, 1220 (11th Cir. 2019) (*en banc*). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action, *id.* at 1221, after which the plaintiff has the "opportunity to demonstrate that the proffered reason was not the true reason for the employment decision," which "merges with the ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Alternatively, a plaintiff can prevail under the single-motive theory outside of the *McDonnell Douglas* framework by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City, Ga. (Lewis II)*, 934 F.3d 1169, 1185 (11th Cir. 2019). "A convincing mosaic may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (quotations marks omitted).

Regardless of the theory of discrimination, "our sole concern is whether unlawful discriminatory animus motivated the decision." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (cleaned up). "We do not sit as a super-personnel department, and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Id.* (quotation marks omitted). Thus, "an employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999). "And, in carrying out its business and in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law." *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176–77 (11th Cir. 2000).

Here, the district court properly granted summary judgment on Williams's discrimination claim based on her termination. We consider the hostile-work environment claim separately in the next section.

To begin with, the district court did not err by failing to address a mixed-motive theory of discrimination because Williams failed to properly raise that theory

11

below.  It is well-established "that arguments not raised at the district court level will generally not be considered on appeal."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598 (11th Cir. 1995) (*en banc*).  This rule applies not only to claims that were never raised in a complaint, but also to "grounds alleged in the complaint but not relied upon in summary judgment."  *Id.* at 599.  The onus is on the parties to formulate arguments; the court has no obligation to "distill every potential argument that could be made based upon the materials before it."  *Id.*

While Williams was not required to plead a mixed-motive theory in her complaint, she failed to raise any argument along those lines in her response in opposition to HAS's summary-judgment motion, which analyzed Williams's discrimination claim under the *McDonnell Douglas* framework.[6]  Because Williams bore the burden of formulating the arguments she wished for the court to address, the court was not required to evaluate the evidence under a theory of discrimination that she did not raise.  *See id.*

In any event, the record evidence, even when construed in the light most favorable to Williams, is insufficient to permit a reasonable inference that HAS's decision to terminate Williams's employment was motivated by her sex, let alone

---

[6] Williams did mention mixed motives in passing with regard to the retaliation claim, but "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

that her sex was the "true reason" for that decision. *See Quigg*, 814 F.3d at 1235. Williams has presented evidence that she was subjected to sexually objectifying comments, nonconsensual touching, and an attempted nonconsensual kiss while working on February 2, 2018, and that a higher-level HAS employee failed to prevent and in fact participated in this unacceptable conduct. Further, it is undisputed that HAS fired her shortly after she complained about this incident. Nevertheless, Williams has failed to rebut the reason offered for her termination— that she lost control of her keys and failed to report that fact—or otherwise to show that HAS was motivated by bias against her sex when it fired her.

First, Williams's evidence does not cast doubt on whether HAS had an "honest impression that [she] violated a work rule" that warranted termination. *Damon*, 196 F.3d at 1363 n.3. Undisputed facts in the record show that two master keys were found in a resident's unit at River Pointe on February 2, that these keys were in fact Williams's, and that before her termination five days later she did not regain possession of the keys or inform Stewart, her supervisor, that the keys were outside her control. Williams also admits that she knew that HAS policy required her to maintain possession of her keys and that lost keys could put residents in danger and HAS at risk of liability. Accordingly, the material facts surrounding HAS's proffered reason for her termination are not genuinely disputed.

13

Williams questions how HAS determined that the unmarked keys were hers and suggests that its investigation was inadequate. However, "the employer can lawfully act on a level of certainty that might not be enough in a court of law." *Total Sys. Servs., Inc.*, 221 F.3d at 1176–77. And we see no evidence to contradict Stewart's testimony that the resident who found and turned in the keys identified Williams, either by name or by appearance. It's undisputed that Williams was inspecting units at River Pointe on February 2, the date the keys were found, and Williams testified that she left signed notices informing residents that their unit had been inspected when they were not present. Plus, as we just noted, there is no genuine dispute that the keys were in fact Williams's.

Nor is pretext shown by the fact that Marshall ordered Williams to give her keys to Salazar. For starters, Williams admits that she did not tell Stewart or Dean (the Human Resources Director) of this fact until after they had informed her of her termination. To the extent Williams contends that HAS should have immediately reconsidered the termination decision in light of this information, we do not conclude that states a claim here. HAS gave Williams the option of appealing the termination—and presenting information about the circumstances under which she lost control of her keys—but Williams chose not to pursue that route. Moreover, even with this new information, HAS still had reason to believe that Williams violated HAS policy by failing to regain possession of her keys or to report that the

14

keys were outside her control.  Williams understandably would have been distracted and upset by Marshall and Salazar's actions on February 2, but HAS's failure to excuse her policy violation in light of those circumstances does not mean that its actions were discriminatory.  *See Alvarez*, 610 F.3d at 1266 (stating that "it is not our role to second-guess the wisdom of an employer's business decisions").

Second, the inconsistencies and contradictions in the evidence that Williams identifies do not relate to the decision to terminate her employment.  Rather, they primarily concern what occurred on February 2, such as whether Marshall made sexist comments to Williams, and when HAS officials learned of Williams's claim of harassment.  However, none of HAS's witnesses provided contradictory or shifting reasons for Williams's termination.  *See id.* at 1265 ("To show pretext, [the plaintiff] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions *in the employer's proffered legitimate reasons for its action* that a reasonable factfinder could find them unworthy of credence." (emphasis added) (quotation marks omitted)).  Therefore, even resolving these factual disputes in Williams's favor, the evidence does not suggest pretext in HAS's proffered reason for Williams's termination.

Third, sexist comments by Marshall and Salazar are insufficient to create an issue of material fact regarding HAS's discriminatory intent.  Evidence of discriminatory comments by non-decisionmakers unrelated to the employment

decision at issue is generally "too weak to raise a genuine fact issue." *Id.* at 1268. Although the ultimate decisionmakers (Davis and Stewart) arguably were aware of the sexist comments when they terminated Williams's employment, there is no evidence that Marshall or Salazar had any role in the decision to terminate Williams's employment. Accordingly, Williams's evidence on this point is too weak and remote to raise a genuine fact issue regarding HAS's discriminatory motives.

Finally, Williams fails to identify any similarly situated male employees who were treated better than she was for similar misconduct. *See Lewis I*, 918 F.3d at 1227 (explaining that a valid comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff"). Indeed, there was testimony that no previous HAS employee had lost possession of master keys. Moreover, HAS presented evidence that Williams was replaced by a woman. So we may draw no hint of discriminatory intent from Williams's replacement or from HAS's treatment of other employees.

For these reasons, and regardless of the theory or framework we apply, no reasonable jury could return a verdict in Williams's favor on her discrimination claim. Even construing the evidence in the light most favorable to Williams, the record does not permit a reasonable inference that the termination decision was motivated by bias against her sex.

16

**B.**

As for Williams's claim that HAS subjected her to a hostile work environment, a plaintiff can prove unlawful discrimination in violation of Title VII with evidence of "a hostile work environment that changes the terms and conditions of employment," even if the employee was not discharged or demoted. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (*en banc*) (quotation marks omitted). To be actionable, the offending workplace behavior "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002). (quotation marks and ellipsis omitted). However, "the sporadic use of abusive language," "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are generally insufficient to meet the standard for objective severity. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786–88 (1998) (citation and quotation marks omitted).

Here, summary judgment was appropriate even assuming a hostile work environment claim was properly before the district court.[7] Williams presented

---

[7] Our review of the record shows that this claim was not properly raised below. Williams's complaint did not give fair notice that she intended to bring a hostile work environment claim. *See Bell Atl. Corp. v. Twombly*, 500 U.S. 544, 555 (2007) (explaining that a complaint must give "the defendant fair notice of what . . . the claim is and the grounds upon which is rests" (quotation marks omitted)). Rather, she alleged that HAS engaged in sex discrimination only when it "failed to investigate her allegations and wrongfully terminated her employment." The fact that she

17

evidence that on one occasion, a contractor (Salazar) and a higher-level HAS employee (Marshall) made lewd comments about her body (that she was "pretty" and had a "cute" rear end and a "sexy walk"), that Salazar touched her and attempted to kiss her, and that Marshall thereafter commented about her and Salazar needing a private moment. Williams also testified that Salazar previously called her "Sweetie" and that Marshall told her that he wished "he would have met [her] before he got married."

The conduct Williams alleges is indefensible; it is without a doubt inappropriate and demeaning. But under our case law, it is not sufficient to satisfy the standard of objective severity and pervasiveness required for hostile work environment claims. *See*, *e.g.*, *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1242-43, 1247-49 (11th Cir. 1999) (*en banc*) (concluding that a supervisor's conduct in which he "constantly" followed the plaintiff and stared at her, twice made a "sniffing motion" while looking at the plaintiff's groin area, once made a sniffing sound without looking at her groin, rubbed his hip against the plaintiff's hip while touching her shoulder and smiling, and once told the plaintiff, "I'm getting fired up" was not severe or pervasive); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583-86 (11th Cir.

---

asserted harassment in her EEOC charge is not alone sufficient. *See Maniccia v. Brown*, 171 F.3d 1364, 1367 n.1 (11th Cir. 1999) ("Whether [the plaintiff] alleged sexual harassment in prior proceedings does not affect the contents of her complaint."), *abrogated on other grounds by Lewis,* 918 F.3d at 1224. And "[d]espite the liberal pleading standard for civil complaints, plaintiffs may not raise new claims at the summary judgment stage." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015) (quotation marks omitted).

18

2000) (concluding that the alleged harasser's conduct in suggesting lunch at Hooters, telling the plaintiff that she was "looking very beautiful," frequently calling her at night and on the weekends, unbuckling his pants and tucking in his shirt in front of her, staring at her twice, touching her ring and bracelet once, repeatedly asking her to lunch, placing his hand on her knee once, and touching the hem of her dress once was not sufficiently severe or pervasive), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  Plus, soon after HAS learned of Williams's complaints about Salazar, HAS, through Clark, arranged that Salazar would no longer be working at River Pointe (or at all with HAS in Savannah).  Under these circumstances and given this Court's prior precedent on the level of objective severity and pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII, we must conclude that summary judgment was properly granted on this claim.

## C.

Finally, we consider Williams's retaliation claim.  Title VII prohibits employers from retaliating against employees for complaining of discriminatory treatment.  *See* 42 U.S.C. § 2000e-3.  For Title VII retaliation claims based on circumstantial evidence, we use the ordinary burden-shifting framework described above.  *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020).  So if a plaintiff has established a *prima facie* case and the defendant offers a legitimate,

19

non-retaliatory reason for its action, the burden shifts back to the plaintiff to prove that the reason offered by the defendant was a pretext for retaliation.  *Id.*

Here, the district court did not err in granting summary judgment to HAS.  As the court found, Williams established a *prima facie* case of retaliation based on the close temporal proximity between her protected activity and her termination.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.").  However, HAS offered a legitimate, non-retaliatory reason for her termination—that she lost possession of her keys and failed to report that fact—so the burden shifted back to Williams to prove that the reason offered by the defendant was a pretext for retaliation.  *See Johnson*, 948 F.3d at 1325.

As we explained above regarding her discrimination claim, Williams has not shown that HAS's proffered reason for her termination was pretextual.  Specifically, Williams's evidence does not cast doubt on whether HAS had an "honest impression that [she] violated a work rule"—that is, that she lost control of her keys and failed to report that fact—that warranted termination.  *See Damon*, 196 F.3d at 1363 n.3.

Williams cites some vague comments from HAS witnesses and asserts that they were unhappy she had complained about Salazar's conduct directly to his employer.  But in the absence of evidence from which a reasonable jury could

20

disbelieve the reason HAS offered for Williams's termination, these comments—which were hardly critical of Williams's actions—are too weak to create a genuine issue of material fact as to whether retaliatory animus was the "true reason" for her termination.  *Cf. Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1309 (11th Cir. 2007) ("Crawford erroneously argues that evidence of a discriminatory animus allows a plaintiff to establish pretext without rebutting each of the proffered reasons of the employer.").  For the same basic reasons, Williams has not presented a "convincing mosaic" of circumstantial evidence that would permit a reasonable jury to infer intentional retaliation.  *Cf. Lewis II*, 934 F.3d at 1185.

## IV.

In sum, and for the reasons stated, the district court properly granted summary judgment on Williams's claims of sex discrimination and retaliation.  We therefore affirm the judgment in favor of HAS.

**AFFIRMED.**